# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-01397-NYW

MARK JACKSON,

      Plaintiff,

v.

STONEBRIDGE HOSPITALITY ASSOCIATES, LLC, d/b/a HOMEWOOD SUITES,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendant Stonebridge Hospitality Associates, LLC's ("Defendant" or "Stonebridge") Motion for Summary Judgment (or "Motion"), filed August 9, 2019. [#50]. The undersigned considers the Motion pursuant to 28 U.S.C. § 636(c) and the Order of Reference for all purposes dated August 29, 2018, [#15], and concludes oral argument will not materially assist in the resolution of this matter. Accordingly, having reviewed the Motion and associated briefing, the applicable case law, and the entire record, I **GRANT** the Motion for Summary Judgment for the reasons stated herein.

## PROCEDURAL HISTORY

      This civil action arises out of allegations by Plaintiff Mark Jackson ("Plaintiff" or "Mr. Jackson"), a former employee of Stonebridge, that Defendant discriminated against him because he is African-American and retaliated against him for opposing discrimination in the workplace. *See generally* [#1; #4; #6]. Believing Defendant's conduct violated his civil rights under Title VII of the Civil Rights Act of 1964 ("Title VII), 42 U.S.C. §§ 2000e *et seq.*, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about

February 8, 2017.  *See* [#6 at 2].  The EEOC dismissed Plaintiff's charge of discrimination and retaliation and issued him a Notice of Right to Sue letter on or about March 7, 2018.  *See* [*id.*].  On June 6, 2018, Plaintiff initiated this action by filing his pro se Complaint and asserts claims under Title VII for disparate treatment based on race ("Claim 1") and for retaliation ("Claim 2") as well as a state law claim for breach of an implied contract of employment ("Claim 3").  *See* [#1; #6].

The Parties proceeded through discovery, and Stonebridge filed the instant Motion for Summary Judgment on August 9, 2019, arguing for summary judgment in its favor on all of Mr. Jackson's claims.  *See* [#50].  Mr. Jackson has since responded in opposition to the Motion for Summary Judgment and Defendant replied.  *See* [#52; #54].  This matter is set for a four-day jury trial to commence on February 10, 2020.  Because the Motion is now ripe for consideration, I consider the Parties' arguments below.

## LEGAL STANDARDS

### I.      Rule 56

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).  It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial.  *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  And the court will "view the factual record and draw all reasonable inferences therefrom most favorably

to the nonmovant." *Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

In applying this legal standard, the court is mindful that Mr. Jackson proceeds pro se and thus liberally construes his filings. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the court does not act as his advocate and applies the same procedural rules and substantive law to Mr. Jackson as to a represented party. *See Murray v. City of Tahlequah,* 312 F.3d 1196, 1199 n.2 (10th Cir. 2008).

## II. Evidence on Summary Judgment

Once the movant demonstrates an absence of evidence supporting an essential element of the nonmovant's claim, the burden shifts to the nonmovant to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To satisfy this burden, the nonmovant must point to specific facts in an affidavit, deposition, answers to interrogatories, admissions, or other similar admissible evidence demonstrating the need for a trial. *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995); *cf. Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) ("[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 252 (1986))). Conclusory statements or those based on speculation, conjecture, or surmise provide no probative value on summary judgment, *see Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990); nor may the nonmovant rely on "mere reargument of his case or a denial of an opponent's allegation," *see* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998).

The onus is therefore on the nonmovant to point to competent summary judgment evidence demonstrating a need for trial. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The court cannot and does not weigh the evidence presented or determine the credibility of witnesses, *see Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008), and may consider only admissible evidence, *see Johnson v. Weld County Colo.*, 594 F.3d 1202, 1209 (10th Cir. 2010) (disregarding hearsay on summary judgment when proper objection to its use was before the court and no exception applied). While the evidence need not be in a <u>form</u> that is admissible at trial (e.g., affidavits are often inadmissible at trial on hearsay grounds), the <u>substance</u> must be admissible at trial. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016); *accord Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) ("Although a party may submit an affidavit or declaration in opposing summary judgment, the content must be based on personal knowledge and must set forth facts that would be admissible in evidence." (internal quotation marks omitted)). "To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

## ANALYSIS

### I. Undisputed Material Facts

This court draws the following undisputed material facts from the record.

1. On or about February 3, 2016, Defendant hired Mr. Jackson, an African-American male, as a Social Hour Attendant at Defendant's Homewood Suites, a hotel located in Denver, Colorado. *See* [#50-1 at ¶¶ 3, 8; #50-3 at 58:18-20;[1] #52 at 287, ¶ 3].

---

[1] When citing to a transcript, the court cites the document number generated by the court's Electronic Court Filing ("ECF") system but the page and line numbers generated by the transcript. But when citing to a transcript provided by Plaintiff, the court cites to the page number generated by the ECF system and the line numbers generated by the transcript.

2.       As a Social Hour Attendant, Mr. Jackson's duties included preparing meals for the social hour—a two-hour period in the evenings when guests of the Homewood Suites could eat at a buffet.  *See* [#50-3 at 60:12-61:1; #52 at 287, ¶ 6].

3.       Mr. Jackson worked approximately 30 hours per week, including four shifts of seven hours beginning at 2:00 p.m., though he sometimes worked longer than his scheduled seven hours.  *See* [*id.* at 61:7-62:7, 63:16-64:5].

4.       Mr. Kevin Smith, an African-American male, was the Food and Beverage Manager for Homewood Suites and was Mr. Jackson's immediate supervisor; Mr. Gustavo de Almeida, a Hispanic male, was the Assistant General Manager for Homewood Suites and was Mr. Smith's immediate supervisor; and Mr. Tom Sprankle was the General Manager of the Homewood Suites.  *See* [#50-1 at ¶¶3, 5-7; #50-3 at 65:15-18; #52 at 110:23-111:7].

5.       On or about Mr. Jackson's first day of employment, he completed Stonebridge's New Hire Orientation, which included an overview of Stonebridge's personnel and safety policies, and received and reviewed Stonebridge's Associate Handbook.  *See* [#50-1 at ¶¶ 9-10; #50-2; #50-3 at 66:6-14, 66:24-67:6, 67:22-24, 68:9-18, 69:5-7; #50-4 at 6].

6.       Stonebridge's Associate Handbook (the "handbook"), which Mr. Jackson contends constitutes an employment contract with Stonebridge, provides, in pertinent part,

> EMPLOYMENT WITH STONEBRIDGE COMPANIES IS AT-WILL. ASSOCIATES HAVE THE RIGHT TO END THEIR WORK RELATIONSHIP WITH THE COMPANY, WITH OR WITHOUT ADVANCE NOTICE AND FOR ANY REASON. THE COMPANY HAS THE SAME RIGHT.
>
> THE LANGUAGE USED IN THIS HANDBOOK AND ANY VERBAL STATEMENTS MADE BY MANAGEMENT DO NOT CONSTITUTE AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT. NOR DO WE GUARANTEE EMPLOYMENT FOR A SPECIFIC LENGTH OF TIME OR NUMBER OF HOURS. ANY CONTRACT OR AGREEMENT REGARDING THE TERMS OF YOUR EMPLOYMENT MUST BE IN WRITING AND

SIGNED BY THE PRESIDENT, THE COO, OR APPOINTED ASSOCIATE OF THE COMPANY.

THE VIOLATION OF ANY PROCEDURE, RULE, REGULATION OR CODE MAY RESULT IN DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION.

[#50-2 at 5].

7.     The handbook warns employees that seven absences or seven instances of "lateness" "in a twelve month [sic] period are considered excessive and may be grounds for termination"; it also prohibits Stonebridge employees from having personal visitors or taking personal calls while at work.  *See* [*id.* at 6].

8.     Approximately three weeks after Mr. Jackson began working for Defendant, he injured his back at work while attempting to put trash in a trash can, causing him to miss several days of work.  *See* [#50-1 at ¶ 11; #50-3 at 69:14-72:11; #52 at 287, ¶ 4].

9.     Plaintiff received medical treatment for his injury pursuant to Stonebridge's workers compensation coverage.  *See* [#50-1 at ¶ 12; #52 at 101:1-102:3; #52 at 287, ¶ 4].

10.     Plaintiff's medical treatment included several doctor's appointments, scheduled during or near his 2:00 p.m. work shifts, resulting in Mr. Jackson being tardy to work on several occasions.  *See* [#50-1 at ¶¶ 13-14; #52 at 106:7-23, 107:15-18; #52 at 287, ¶ 5].

11.     Plaintiff's tardiness and absenteeism became an issue of concern with Messrs. Smith, de Almeida, and Sprankle, *see, e.g.*, [#50-1 at ¶ 24; #50-4 at 3; #50-8; #50-10 at 1-2; #50-13; #50-15; #50-16]; and Mr. Jackson was similarly warned about parking in an improper parking spot, being on the phone during working hours, and taking unauthorized breaks, *see, e.g.*, [#50-3 at 120:9-121:17, 123:8-124:5, 125:10-18, 130:1-22; #50-5; #50-6; #50-10].

12.     On or about May 4, 2016, Mr. Jackson met with Mr. Sprankle to discuss the scheduling of Mr. Jackson's doctor's appointments and Mr. Jackson's complaints of racial

discrimination and retaliation concerning Mr. de Almeida's citation of Plaintiff for parking in an improper parking spot and using his cell phone during working hours. *See* [#50-1 at ¶ 21, #50-3 at 105:13-17, 111:1-10, 122:8-13; #50-4 at 2; #50-8; #50-9; #52 at 131:5-12].

13. Mr. Sprankle explained that Mr. Jackson was not getting paid for his doctor's appointments scheduled during working hours, directed Mr. Jackson to schedule his appointments during non-working hours if possible (if not, Mr. Jackson was to contact Mr. Sprankle), and reminded Mr. Jackson of the expectation that he arrive to work on time. *See* [#50-1 at ¶¶ 25-27; #50-3 at 105:13-17, 114:13-115:2; #50-8; #52 at 131:5-12, 132:1-20; #52 at 288, ¶ 13].

14. As to Mr. Jackson's complaints of racial discrimination and retaliation, Mr. Sprankle explained he investigated the complaints and did not find any corroborating evidence; Mr. Jackson signed a statement to this effect but included his own notation that Mr. Sprankle's conclusion was to the best of Mr. Jackson's knowledge. *See* [#50-1 at ¶¶ 28-32; #50-3 at 116:5-10, 117:20-120:8; #50-4 at 2; #50-9; #52 at 288, ¶ 13].

15. Following the May 4, 2016 meeting with Mr. Sprankle, Mr. Jackson scheduled four doctor's appointments during working hours despite the availability of appointments during non-working hours, and he never discussed them with Mr. Sprankle. *See* [#50-1 at ¶¶ 33, 38; #50-10 at 1-2].

16. This led to another meeting with Mr. Sprankle, this time with Mr. de Almeida, on June 2, 2016, at which Messrs. Sprankle and de Almeida presented Mr. Jackson with a written warning and performance plan concerning Mr. Jackson's tardiness and other infractions; Mr. Jackson again complained that Mr. de Almeida was discriminating and retaliating against Mr. Jackson because of his race; and Mr. Sprankle suspended Mr. Jackson for three days based on Plaintiff's tardiness and other infractions—Plaintiff believes his threats to report Mr. de Almeida

to the EEOC were the cause of the suspension.  *See* [#50-1 at ¶¶ 39-40; #50-3 at 122:25-126:10, 131:6-132:15; #50-4 at 2; #50-10; #50-12; #50-16; #52 at 163:16-164:11, 164:22-165:8, 166:9-24; #52 at 289, ¶ 15].

17.     Plaintiff did not again complain of any discriminatory and/or retaliatory conduct after the June 2 meeting until his termination in August 2017.  *See* [#50-3 at 152:17-153:5, 154:21-155:11].

18.     Mr. Smith (and a representative from Human Resources) raised concerns with Mr. Jackson regarding his "constant tardiness" on August 3, 2016, *see* [#50-1 at ¶ 43; #50-3 at 142:1-23, 144:2-6, 147:4-9, 147:16-148:16; #50-13; #52 at 289, ¶ 17].

19.     Mr. Jackson met with Mr. Smith again on August 25, 2016, and Mr. Smith suspended Mr. Jackson given his ongoing tardiness, though Mr. Jackson asserts this suspension was in retaliation for his complaints of discrimination, not his tardiness.  *See* [#50-1 at ¶ 44; #50-3 at 149:13-24, 151:4-13, 152:4-16; #50-4 at 3; #50-14; #52 at 289, ¶ 17; #52 at 290, ¶ 18].

20.     On or about August 29, 2016, upon returning from his suspension, Stonebridge terminated Mr. Jackson's employment, citing "[e]xcessive tardiness," including being late to work "at least 29 times in the last 6 months," as the reason for termination.  *See* [#50-1 at ¶¶ 45-46; #50-3 at 148:4-13, 150:22-25, 151:14-25; #50-15; #52 at 290, ¶ 18].

21.     Believing his termination and suspensions (for infractions other non-African-American employees committed without consequence) constituted racial discrimination and retaliation, *see generally* [#6; #50-3 at 189:4-5; #52], Mr. Jackson filed a charge of discrimination and retaliation with the EEOC on or about February 8, 2017, and the EEOC dismissed Plaintiff's charge of discrimination and retaliation and issued him a Notice of Right to Sue letter on or about March 7, 2018, *see* [#1 at 16-17].

22.     Plaintiff initiated this action on June 6, 2018.  *See* [#1].

## II.     Title VII – Claims 1 and 2

Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Title VII also makes it unlawful to subject an employee to a hostile work environment, *see Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007), or to retaliate against an employee for opposing practices made unlawful by the statute, *see Hansen v. SkyWest Airlines*, 844 F.3d 914, 924-25 (10th Cir. 2016).  Mr. Jackson asserts both a disparate treatment claim (Claim 1) and a retaliation claim (Claim 2) under Title VII.

On summary judgment, a plaintiff may prove her disparate treatment and retaliation claims with direct evidence of discrimination or retaliation or, in the absence of direct evidence, under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2]  *See Tabor v. Hilti, Inc.*, 703 F. 1206, 1216 (10th Cir. 2013) (disparate treatment); *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (retaliation).  "Under this framework, the plaintiff must first prove a prima facie case of discrimination." *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018) (internal quotation marks omitted).  "Then, the defendant may come

---

[2] I find that Mr. Jackson fails to adduce evidence that "demonstrates on its face that the employment decision was reached for discriminatory reasons," *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108,1117 (10th Cir. 2007), as even comments that reflect a personal bias are not *per se* direct evidence of discrimination unless the plaintiff demonstrates that the speaker had decisionmaking authority and acted on her discriminatory animus, *see Tabor*, 703 F.3d at 1216; *cf. Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (noting in context of age discrimination claim, "isolated or ambiguous comments are too abstract to support a finding of age discrimination."  (brackets, ellipsis, and internal quotation marks omitted)).  Thus, I analyze Claims 1 and 2 under the familiar *McDonnell Douglas* burden-shifting framework.

forward with a legitimate, non-discriminatory or non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011).

### A. Prima Facie Case

***Disparate Treatment***. To establish a prima facie race discrimination claim, Mr. Jackson must demonstrate that he is a member of a protected class who suffered an adverse employment action that "occured under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (footnote omitted); *Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013) ("The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." (internal quotation marks omitted)). Mr. Jackson's burden in this regard is not onerous; he needs to put forth only enough to raise an inference of discrimination, not dispel Defendant's non-discriminatory reasons. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).

Defendant does not dispute that Plaintiff is a member of a protected class who suffered an adverse employment action, which includes his two suspensions and termination. *See Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (explaining that adverse employment action "includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (internal brackets and quotation marks omitted)). But Defendant contends that Mr. Jackson cannot establish a prima facie case of discrimination, because he cannot demonstrate that circumstances surrounding his adverse employment actions give rise to an inference of discrimination. *See* [#50 at 14; #54 at 5-6].

According to Defendant, the only two incidents that Mr. Jackson identifies where he was treated differently than individuals outside of a protected class was when he was disciplined for having parked in an unauthorized parking spot or when his request to bring his child to work was denied despite a white employee receiving permission to bring her child to work. *See* [#50 at 14; #54 at 5-6]. In addition to identifying the Caucasian employee, Reid Stewart, who was permitted to park in an area Plaintiff was not, Mr. Jackson testified that "there were other employees whose names I do not know." [#50-3 at 94:3-7]. Mr. Stewart also attested that he parked his vehicle in the alley "[i]n the exact same place as Mr. Jackson" and that he "utilized the space multiple times during [his] tenure and was never written up for parking in said space. Management was aware that I utilized the parking space." [#52 at 276]. Mr. Jackson further denies that these were the only two incidents where he was treated differently than others outside his protected class, including being disciplined for using his phone at work when others outside of his protected class were not. [#52 at ¶ 37; #50-10 at 2]. Thus, the operative inquiry is whether these incidents, coupled with Mr. Jackson's testimony, give rise to an inference of discrimination.

As an initial matter, the court notes that none of these actions—the verbal warning associated with Mr. Jackson's improper parking [#50-6], the denial of Mr. Jackson's request to bring his son to work [#52 at ¶ 31], or the discipline for personal use of his phone at work [#50-5]—amount to a material adverse action in and of themselves. *See McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) (observing that a material adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different job responsibilities or a decision causing a significant change in benefits). Nor is it clear that any of these incidents led to the adverse actions of his two suspensions or ultimate termination. Indeed, the stated reason for Mr. Jackson's first suspension was tardiness

and absenteeism—not improper parking, his request to bring his son to work, or his cell phone usage. [#50-1 at ¶ 39]. Similarly, Mr. Jackson was suspended again in August 2016 for consistent tardiness. [#50-13 at 1]. And Mr. Jackson was ultimately terminated for consistent tardiness, i.e., being late for work at least 29 times in the last 6 months. [#50-15 at 1].

While overemphasis on these instances is somewhat misplaced, this court liberally interprets Mr. Jackson's Response to mean that Defendant's pattern of discipline against him gives rise to an inference of discrimination. And as mentioned, Mr. Jackson's burden of demonstrating a prima facie case is *de minimis*. *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005); *see also Argo*, 452 F.3d at 1201 ("For most plaintiffs, establishing a prima facie case is perfunctory, and liability turns on whether the defendant's stated explanation for the adverse employment action is pretextual."). Thus, given Mr. Stewart's Affidavit and Mr. Jackson's own testimony, I find—without passing on the merits or credibility of any Party's evidence—that Mr. Jackson adequately demonstrates a prima facie case of disparate treatment.

*Retaliation*. To plead a plausible retaliation claim, Mr. Jackson must establish (1) he "engaged in protected opposition to discrimination," (2) "a reasonable employee would have found the challenged action materially adverse," and (3) "a causal connection existed between the protected activity and the materially adverse action." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (internal quotation marks omitted). Mr. Jackson must establish that his protected activity was a but-for cause of the adverse employment decision. *See Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014); *Bennett*, 792 F.3d at 1269 (explaining that a plaintiff must "demonstrate that, but for her protected activity, she would not have faced the alleged adverse employment action.").

12

It is undisputed that Mr. Jackson complained of racial discrimination and retaliation at least three times while employed with Stonebridge—once in April 2016, again in June 2016, and finally in August 2016. *See* Undisputed Material Facts, at ¶¶ 11-12, 16-17, 19, 21. Upon review of the record, this court concludes that there is insufficient evidence to create a genuine issue of material fact that any one of Mr. Jackson's complaints, standing alone, was causally connected to any materially adverse employment action. For instance, notwithstanding Plaintiff's assertions that Mr. de Almeida cited Plaintiff for various infractions and Mr. Sprankle allegedly threatened to terminate Plaintiff if Plaintiff did not sign Mr. Sprankle's investigation findings after his April 2016 complaints,[3] these instances of alleged retaliation did not deter Plaintiff from continuing to complain about perceived racial discrimination and retaliation. *See McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006) ("The materiality of a claimed adverse action is to be determined objectively; petty slights, minor annoyances, and simple lack of good manners will not deter a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks omitted)). Nor is there any evidence to suggest Plaintiff's suspension in August 2016 was causally connected to his complaints of racial discrimination and retaliation, as Mr. Jackson unequivocally testified that he did not again complain of racial discrimination and retaliation between June 2, 2016 and at least August 25, 2016. *See* [#50-3 at 152:17-153:10, 155:4-11].

But, in viewing the evidence in a light most favorable to Mr. Jackson, there is an arguable dispute of material fact as to when Mr. Sprankle <u>informed</u> Plaintiff of his June 2 suspension—either before or after Mr. Jackson threatened to go to the EEOC. *Compare* [#50-1 at ¶ 39] *with*

---

[3] The Tenth Circuit has "never expressly held that an unrealized threat of termination, without more, constitutes an adverse employment action," though the Tenth Circuit has suggested special circumstances (not present here) may warrant a different conclusion. *See Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1268 (10th Cir. 2005).

[#50-3 at 131:6-14, 132:7-15; #52 at 289, ¶ 15]; *see also Argo*, 452 F.3d at 1193 (explaining that a close proximity between the protected activity and the adverse employment action "is sufficient to allow an inference that a causal connection existed between the internal grievance and the decision to terminate Mr. Argo."). And the same is true of Mr. Jackson's termination, given his testimony that <u>in or around August 2016</u> he overheard Mr. Smith suggesting to Mr. Sprankle that Mr. Smith terminate Plaintiff to avoid the appearance of discrimination because both Messrs. Smith and Jackson are African-American. *See* [#52 at 181:13-182:18, 219:16-25].[4] Given the serial nature of Mr. Jackson's complaints and the escalating nature of the discipline against Mr. Jackson, and given the fact that the court does not weigh the credibility of any of the witnesses, I conclude that Mr. Jackson has adduced sufficient evidence to avoid summary judgment based on the lack of a causal connection between his complaints of racial discrimination and retaliation and his ultimate termination. *Cf. Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1267 (10th Cir. 2009) (approving the notion that "when the adverse action occurs on the heels of protected activity, such a circumstance would be limited to matters occurring within days, or at most, weeks of each other" but not where "months separated the alleged protected activity and adverse action.").

### B.      Legitimate, Non-Discriminatory Reason

Having concluded that Mr. Jackson establishes a prima facie case for disparate treatment and retaliation, the burden now shifts to Stonebridge to proffer admissible evidence that discriminatory animus did not motivate their suspensions and termination of Mr. Jackson. *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (noting that the defendant's

---

[4] Plaintiff's testimony as to Mr. Smith's alleged statements is likely admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence to the extent Mr. Smith is an agent or employee of Stonebridge and made the statement within the scope of that relationship and while it existed. *See Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1172 (10th Cir. 2003) (holding as admissible under Rule 802(d)(2)(D) "a vice president's statements concerning his company's unethical treatment of a direct subordinate.").

burden of production does not involve a credibility assessment) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)). "The defendant's burden is exceedingly light . . ., as its stated reasons need only be legitimate and non-discriminatory on their face[.]" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (internal citations and quotation marks omitted). I conclude Stonebridge satisfies this low burden.

As justification for Mr. Jackson's suspensions and termination Stonebridge states Mr. Jackson had "a well-documented history of performance concerns, dating back nearly to the start of his employment," namely his tardiness and absenteeism, of which Stonebridge warned Mr. Jackson but to no avail. *See* [#50 at 18-19; #54 at 9-10]. Indeed, the record reflects Mr. Jackson's tardiness and absenteeism and Stonebridge's concerns with the same. *See, e.g.*, Undisputed Material Facts, at ¶¶ 10-13, 15-19. Thus, I find Defendant has established a legitimate, non-discriminatory reason for Plaintiff's suspensions and termination.

## C. Pretext

Because Defendant's justification for suspending and terminating Mr. Jackson does not violate Title VII on its face, the burden shifts back to Mr. Jackson to show Defendant's justification was pretextual. *See E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 989 (10th Cir. 2012); *see also Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (explaining the plaintiff now has the full burden of persuasion that her employer terminated her because of her race). "A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017). But mere conjecture or speculation is not enough. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1200 (10th Cir. 2015). Rather, the court must examine the

facts as they appeared to the person who decided to terminate the plaintiff, and the court will not second-guess the propriety of that decision if the employer believed its legitimate, non-discriminatory reasons and acted in good faith on those reasons. *See Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017).

Mr. Jackson may establish pretext in a variety of ways. For instance, Mr. Jackson may provide evidence demonstrating Defendant's proffered reasons for his suspensions and termination were false, or evidence demonstrating Defendant acted contrary to written policy applicable to the situation at hand, or evidence demonstrating Defendant treated Mr. Jackson differently than non-African-American employees who violated rules of comparable seriousness. *See DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Kendrick*, 220 F.3d at 1230). For the following reasons, I respectfully conclude Mr. Jackson fails to carry his burden of showing Defendant's justification for his suspensions and termination was pretextual, and thus Stonebridge is entitled to summary judgment in its favor on Claims 1 and 2.

First, Mr. Jackson argues that Defendant's justifications for suspending Plaintiff on June 2 and later terminating Plaintiff—all because of Mr. Jackson's tardiness—are false. *See* [#52 at 14]. He argues Defendant suspended him on June 2 because he threatened to complain of discrimination to the EEOC and terminated him because he filed a charge of race discrimination. *See* [*id.*]. Further, Mr. Jackson argues Stonebridge did not raise concerns about Mr. Jackson's tardiness until after he alleged racial discrimination and retaliation, which was roughly three months after he injured himself on the job, and that Mr. Sprankle agreed to excuse Mr. Jackson's tardiness due to his doctor's appointments as evidenced by Plaintiff not receiving a warning for his tardiness between June 2 and August 3, 2016. *See* [*id.* at 15-16].

To support his position Mr. Jackson relies exclusively on his own Affidavit. *See* [#52 at 287-90].[5] But Mr. Jackson fails to provide competent summary judgment evidence to corroborate these assertions other than his own beliefs that Defendant harbored racial animosity towards him. *See Pasternak v. Lear Petroleum Expl., Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment."). Mr. Jackson offers no evidence other than his Second Amended Complaint and Affidavit to support his pretext contentions. For instance, he points to no specific examples where others who had attendance records consistent with his were not disciplined nor terminated. Nor has he come forward with any specific evidence that others were permitted to be late for their shift due to their worker's compensation appointments. This lack of evidence is particularly striking, because Mr. Jackson retained counsel in a limited representative capacity to assist with discovery in this matter. Mr. Jackson's uncorroborated beliefs are insufficient at summary judgment. *Cf. Johnson*, 594 F.3d at 1211 (explaining, to support a finding of pretext, "[the plaintiff] must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda.").

---

[5] In its Reply, Stonebridge challenges Mr. Jackson's affidavit as a sham affidavit that contradicts his sworn testimony and therefore cannot be used to create a genuine issue of material fact. *See* [#54 at 4-5]. While in some instances the court may disregard an otherwise proper affidavit at summary judgment if it contradicts the affiant's prior sworn testimony, *see Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 956 n.3 (10th Cir. 2012), the court's review of Mr. Jackson's Affidavit [#52 at 287-90] leads it to conclude that Mr. Jackson's Affidavit does not contradict his sworn testimony wholesale. Defendant also challenges Mr. Jackson's reliance on his Second Amended Complaint. To be sure, in opposing summary judgment Mr. Jackson must come forth with admissible evidence to support his complaint. But Mr. Jackson's Second Amended Complaint appears to be verified and courts may consider verified complaints as affidavits pursuant to Rule 56(c)(4) of the Federal Rules of Civil Procedure if the verified complaint is made on personal knowledge, sets out facts that would be admissible in evidence, and shows that the affiant is competent to testify on the matters stated. *See Pipkins v. Taillon*, No. 12-CV-02275-REB-KLM, 2014 WL 4197945, at *4 (D. Colo. Aug. 25, 2014). I find no reason to reject the Second Amended Complaint under Rule 56(c).

Moreover, it is undisputed that Mr. Jackson's doctor's appointments regularly resulted in him being tardy for work—an issue Messrs. Smith, de Almeida, and Sprankle addressed with Mr. Jackson on several occasions. *See* Undisputed Material Facts, at ¶¶ 10-13, 15-20. While the record demonstrates Mr. Jackson believed Defendant's actions were discriminatory and retaliatory, his subjective beliefs are insufficient to create a genuine issue of material fact when the undisputed evidence identifies Plaintiff's tardiness as the reason for his two suspensions and ultimate termination. *See* [#50-1 at ¶ 39; #50-3 at 149:13-18, 150:22-151:25; #50-4 at 3; #50-12; #50-13; #50-14; #50-15]. And Mr. Jackson's denials of wrongdoing are not enough to create a genuine issue of material fact as to pretext. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006) ("Even assuming Metzler subjectively believed she did not have a poor attitude or that her knowledge and performance were up to par, it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of her own relative performance." (brackets and internal quotation marks omitted)). The same is true about his doubts as to Mr. Sprankle's investigation, because even "mistaken belief[s] can be legitimate, non-pretextual reason[s] for an employment decision." *Riggs*, 497 F.3d at 1119. Ultimately, Plaintiff's pretext arguments hinge on speculation and conjecture, but this is not enough to create a genuine dispute of material fact about Defendant's proffered legitimate, non-discriminatory reasons for suspending and terminating Plaintiff. *See Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) ("Speculation, however, will not suffice for evidence [of pretext].").

Second, Mr. Jackson asserts Defendant treated him differently than similarly situated non-African-American employees. To show disparate treatment, [Mr. Jackson] must establish []he was similarly situated to [other employees] in all relevant respects." *McGowan*, 472 F.3d at 745. "When comparing the relative treatment of similarly situated minority and non-minority

employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) (internal quotation marks omitted). But different "treatment between two employees by the same supervisor does not automatically give rise to a Title VII . . . claim." *Timmerman v. United States Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007).

Mr. Jackson identifies two potential non-African-American comparators that Stonebridge treated differently than Mr. Jackson: (1) Reid Stewart, who parked in an improper parking spot without consequence, and (2) Natasha Maksymenko, who brought her child to work, which the handbook prohibits, without consequence. Plaintiff also vaguely references other non-African-American employees who parked in the same area he did; violated the handbook's prohibition on personal cellphone use; and who took regular smoke breaks without punishment. But as discussed above, these individual infractions are not adverse actions in and of themselves. Even assuming these alleged comparators committed infractions without punishment (something that is less than clear from the record), the evidence adduced by Plaintiff is insufficient for a factfinder to conclude these comparators engaged in <u>repeated</u> infractions of <u>similar severity</u> to being tardy. *See* Undisputed Material Facts, ¶¶ 10-13, 15-19. For instance, there is no deposition testimony from Defendant conceding that parking in an improper parking space is equivalent to being tardy in terms of discipline. Nor is there any evidence that any of these other employees were warned as often or as many times as Mr. Jackson without being suspended or terminated. Mr. Jackson simply fails to refute this evidence or establish that any comparator engaged in, or was accused of, similar conduct for purposes of establishing pretext. *See E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 801 (10th Cir. 2007) (holding that the plaintiff failed to show that a female employee was treated differently than a similarly situated male employee, because "[t]he conduct for which Ms. Segovia argues Mr.

Ennis should have been punished, with the exception of his tardiness, is not productivity-related. Although there was evidence that Mr. Ennis was often late to work, there is no evidence that his tardiness prevented him or others from completing their duties.").

Third, to the extent Mr. Jackson seeks to demonstrate pretext because Mr. Sprankle failed to investigate Mr. Jackson's complaints of racial discrimination and retaliation in accordance with Stonebridge's handbook, *see* [#6 at ¶¶ 44-53], he fails to provide any competent summary judgment evidence to corroborate his assertions. Indeed, both Mr. Jackson and Stonebridge provide only a small portion of the handbook, and neither identifies the policies and procedures Mr. Sprankle allegedly violated. Thus, Mr. Jackson fails to demonstrate that Defendant's legitimate, non-discriminatory justifications for his suspensions and termination were pretextual, and summary judgment shall enter in favor of Stonebridge and against Mr. Jackson as to Claims 1 and 2.

## III.    Breach of an Implied Contract of Employment – Claim 3

"Absent an express contract providing otherwise, Colorado law presumes that an employment relationship is terminable at will by either party." *Mullin v. Hyatt Residential Grp., Inc.*, 82 F. Supp. 3d 1248, 1251-52 (D. Colo. 2015) (citing *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 105 (Colo. 1992)). Termination of an at-will employment relationship usually does not give rise to a cause of action, even if done without notice and without cause. *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 546 (Colo. 1997). In some instances, however, policies contained in an employee handbook regarding discipline or termination may overcome the at-will presumption and serve as the basis for a breach of an implied employment contract claim. *See Cummings v. Arapahoe Cty. Sheriff's Dep't*, 440 P.3d 1179, 1185 (Colo. App. 2018); *accord Sidlo v. Millercoors, LLC,* 718 F. App'x 718, 730 (10th Cir. 2018) (explaining that under Colorado law

an implied contract of employment exists if the employer manifested an intent to enter into a binding contract and the employee's continued employment constituted acceptance of and consideration for the promise).  But an employer is not liable if its handbook "clearly and conspicuously disclaimed [an] intent to enter into a contract limiting the right to discharge employees."  *Winkler v. Bowlmor AMF*, 207 F. Supp. 3d 1185, 1190 (D. Colo. 2016) (internal quotation marks omitted) (citing *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo. App. 1997); *Silchia v. MCI Telecomm. Corp.*, 942 F.Supp. 1369, 1375 (D. Colo. 1996)).

Defendant moves for summary judgment on Claim 3, because its handbook "contains a conspicuous disclaimer," on the first page and in all capital letters, that "the handbook does not constitute an express or implied contract of employment."  [#50 at 20 (brackets and internal quotation marks omitted); #54 at 10].  Plaintiff counters that there is a dispute of fact as to whether the handbook constitutes an implied contract, and his Second Amended Complaint suggests Stonebridge breached not only the implied covenant of good faith and fair dealing but the handbook's equal employment opportunity procedures by failing to properly investigate his claims of racial discrimination and retaliation and then plotting to terminate his employment for those complaints.  *See* [#6 at ¶¶ 44-53; #52 at 17-18].  For the following reasons, I respectfully disagree with Mr. Jackson.

First, Mr. Jackson fails to identify or provide any provisions of the handbook that allegedly constitute an implied contract for employment.  *See Zisumbo*, 801 F.3d at 1197 ("Zisumbo fails to identify any specific provisions of [the defendant's] code of conduct that might create an enforceable obligation to [the defendant's] employees.  On this basis alone, we could reject Zisumbo's challenge to the district court's resolution of his good faith and fair dealing claim.").  Second, the handbook "clearly and conspicuously disclaim[s] [an] intent to enter into a contract

limiting the right to discharge employees." *Winkler*, 207 F. Supp. 3d at 1190. Indeed, on page 4

of the handbook under the Introduction heading and in capitalized letters the handbook reads,

> Employment with Stonebridge companies is at-will. Associates have the right to
> end their work relationship with the company, with or without advance notice and
> for any reason. The company has the same right.
>
> The language used in this handbook and any verbal statements made by
> management do not constitute an express or implied contract of employment. Nor
> do we guarantee employment for a specific length of time or number of hours. Any
> contract or agreement regarding the terms of your employment must be in writing
> and signed by the president, the COO, or appointed associate of the company.

[#50-2 at 5 (emphasis omitted)]. I find this sufficient to refute Mr. Jackson's claim of an implied

contract for employment. *See Sidlo*, 718 F. App'x at 730. Accordingly, summary judgment shall

enter in favor of Stonebridge and against Mr. Jackson as to Claim 3.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)  Defendant's Motion for Summary Judgment [#50] is **GRANTED**;

(2)  Summary judgment shall enter in **FAVOR** of Stonebridge and **AGAINST** Plaintiff,

and Mr. Jackson's claims are **DISMISSED with prejudice**;

(3)  Final Judgment shall enter in **FAVOR** of Stonebridge and **AGAINST** Mr. Jackson,

with each party to bear his/her/its own costs and fees;[6]

---

[6] While costs should generally "be allowed to the prevailing party," Fed. R. Civ. P. 54(d)(1), the
district court may in its discretion decline to award costs where a "valid reason" exists for the
decision. *See, e.g., In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, 1147 (10th
Cir. 2009) (citations omitted). Because the issues presented in this matter were close, and because
Plaintiff is indigent, the court declines to award costs. *See Cantrell v. Int'l Bhd. of Elec. Workers,
AFL-CIO, Local 2021*, 69 F.3d 456, 459 (10th Cir. 1995) (noting that there is no abuse of discretion
when the district court denies fees "to a party that was only partially successful."); *Shapiro v.
Rynek*, 250 F. Supp. 3d 775, 779 (D. Colo. 2017) ("[A] district court does not abuse its discretion
in denying costs when . . . the non-prevailing party is indigent.").this court declines to award fees
to Defendant. *See Cantrell v. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 459
(10th Cir. 1995) (noting that there is no abuse of discretion when the district court denies fees

(4)     The four-day jury trial set to commence on **February 10, 2020** is **VACATED**;

(5)     This case shall be terminated; and

(6)     A copy of this Memorandum Opinion and Order shall be sent to:

> Mark Jackson
> 3080 Ash Street
> Denver, CO 80207

DATED: October 31, 2019                    BY THE COURT:

Nina Y. Wang
United States Magistrate Judge

---

where the "issues are close and difficult," or where the prevailing party is only partially successful).

23